J-S49028-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LEEVERNE M. JAMES | |
| Appellant | No. 2190 EDA 2018 |

Appeal from the PCRA Order Entered July 20, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0012427-2008

BEFORE:  BENDER, P.J.E., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.:          **FILED NOVEMBER 25, 2019**

Appellant, Leeverne M. James, appeals from the July 20, 2018 order

dismissing his petition pursuant to the Post Conviction Relief Act ("PCRA"), 42

Pa.C.S.A. § 9541-46.  We affirm.

The PCRA court recited the pertinent facts in its Pa.R.A.P. 1925(a)

opinion:

> On June 14, 2008, Philadelphia Police Officer Nick Lei received a radio call of a shooting in the 5400 block of Gibson Drive.  He arrived on the scene less than a minute later and observed the decedent lying on the sidewalk.  The victim was facing up and there was a lot of blood underneath the victim.  He performed CPR until rescue personnel arrived.
>
> Police Officer David Gerrard also heard the radio call and arrived at approximately the same time.  While other officer [sic] performed CPR, Officer Gerard noticed a large wound around the victim's stomach area.  Officer Gerard also noticed six (6) spent

---

[*] Former Justice specially assigned to the Superior Court.

green shotgun shells around the victim's body. Most of the shells were within two (2) to three (3) feet of the victim. The farthest one was approximately six (6) feet away.

Amy Harris walked from the shooting scene across the street to a 'Chinese Store' immediately following the shooting. Ms. Harris testified that while she was in the store, she heard gunshots. After the shooting stopped, Ms. Harris ran over and saw the decedent down on the ground and saw Appellant, whom she knew as 'Q' carrying a large gun and leaving the scene in a gold car.

Tamika Sims, the victim's sister, was an eyewitness to the shooting. Ms. Sims testified that she observed the shooting from the 'Papi store' which was next to the 'Chinese store.' Ms. Sims saw Appellant, whom she knew as 'Q' fire multiple shots into her brother. After the first shot the decedent fell and Appellant then stood over him and continuously shot at him. Ms. Sims described the gun as a big pump gun. When Appellant finished shooting, he jumped into a gold car and left. At the time of the shooting, Ms. Sims had known Appellant for nine (9) or ten (10) years.

Tayanna Slusher also witnessed the shooting. Ms. Slusher testified that as she was walking from the 'Papi store' towards the shooting scene, she saw Appellant get out of a gold car carrying a big black gun with two hands. Ms. Slusher saw Appellant shoot the decedent. Ms. Slusher saw the decedent fall to the ground while Appellant stood over the victim and continued to fire.

Dr. Edwin Lieberman, the medical examiner, testified that the victim received six shotgun blasts to his body from a distance of approximately three (3) feet. Two blasts were to the left side of his body, which shredded both lungs, his heart, his left kidney, his spleen and his bowel. Another blast was to the left chest, which struck the left lung and bowel. Another blast was to the abdomen and two were to the upper left arm. The victim died as a result of those injuries. Numerous shotgun pellets and other material from the shotgun shells were recovered from the victim's body.

Officer Ernest Bottomer, the ballistics expert, examined the ballistics evidence recovered from the crime scene, as well as the evidence received from the medical examiner and from the search of Appellant's mother's home. The recovered pellets were all .33 caliber Double O buckshot, usually found in a 12 gauge shotgun.

A total of 33 pellets were recovered from the crime scene and from the decedent's body. The fired cartridge shells recovered from the scene were all Remington shells, which were chambered and extracted from the same gun. Each shell was designed to contain eight (8) Double O buckshot pellets. The other shotgun material recovered from the decedent's body was consistent with Remington design. An unfired shotgun cartridge recovered from the rear bedroom in Appellant's mother's apartment[3] was a Remington Double O buckshot with an eight (8) pellet load.

> [3] Evidence was presented that Appellant used that address as his legal address. This evidence was recovered during a search pursuant to consent. Also recovered from that bedroom was a safe, which contained two boxes of Remington Shotgun Shells. The safe was taken pursuant to the consent search, but was not opened until a warrant was obtained authorizing a search of the safe.

The arresting officer, Sgt. Robert Worrick of the Clementon, NJ Police Department testified that Appellant had a tattoo of a Q on his forearm.

> Appellant also testified at trial and denied shooting the victim. He further testified that, on the day of the shooting he had been playing basketball with some of his old friends from high school. The game ended at approximately 4:30 p.m. Appellant testified that he received several telephone calls from friends informing him that Mr. Sims had been shot and that he was accused of the crime. Appellant testified that he never sought out any of these people to support his alibi.

PCRA Court Opinion, 12/5/18, at 2-4.

At the conclusion of trial, a jury found Appellant guilty of first-degree murder and possessing an instrument of crime. On June 24, 2011, the trial court imposed a mandatory life sentence for murder and a concurrent one to two years of incarceration for possessing an instrument of crime. This Court affirmed the judgment of sentence on March 3, 2013. Our Supreme Court denied allowance of appeal on August 6, 2013. Appellant filed this timely first

PCRA petition on April 23, 2014. Appointed counsel filed an amended petition on June 22, 2016. The Commonwealth filed a motion to dismiss the petition on March 15, 2018. On May 25, 2018, the PCRA court filed its notice of intent to dismiss the petition without a hearing pursuant to Pa.R.Crim.P. 907. Appellant filed no response, and the PCRA court entered the order on appeal on July 20, 2018. This timely appeal followed.

On appeal, Appellant claims the trial court erred in dismissing his petition without a hearing because a hearing was necessary to assess the October 2014 affidavit of Appellant's mother, Shirley Dunbar, which forms the basis for Appellant's Amended PCRA petition. In that affidavit, Dunbar stated:

> On June 13, 2008, I was met by two (2) Police Officers outside my door. They asked me if I lived there. I said yes, and then I asked them what was going on. They asked me, where was Q. I told them, my son's name was not Q, but Marqui, and that he doesn't live here. As I opened the door to my apartment to go inside, the two (2) Police Officers walked right in behind me, with their guns out. The Spanish Officer told me that they had to look inside to check and make sure if he is here or not. At that time, I was under the impression that I had no choice but to allow them to search my apartment without a warrant, because I never said they could. After they search all of the bedrooms and found that my son was not there, the Spanish Police Officer came and told me that he had to Secure my apartment. I asked him why, and he said it was because he saw ammunition in the back bedroom, and that my son had shot somebody. So I asked, 'What, is this you-all's apartment now?' The Spanish Police Officer said, yes, it's our apartment now. I was upset and scared about the whole situation, so I left out the apartment for a few to calm my nerves. I came back a little later and the Spanish Officer yelled and cursed at me. He told me, I can't be running in and out of my own apartment, and to either stay in or get the hell out.

Appellant's Memorandum of Law in Support of Amended PCRA Petition, 6/23/16, at Exhibit D.[1]  Based on this affidavit, Appellant claims trial counsel was ineffective for failing to call Dunbar as a witness and for failing to file a motion to suppress evidence gathered from the search of Dunbar's home.

On review, we must discern whether the record supports the PCRA court's order, and whether the court committed an error of law. **Commonwealth v Spotz**, 18 A.3d 244, 258 (Pa. 2011).  We review the PCRA court's legal conclusions *de novo.*  **Id.**  "A petition for post-conviction collateral relief may be granted without a hearing when the petition and answer show that there is no genuine issue concerning any material fact and that the defendant is entitled to relief as a matter of law."  Pa.R.Crim.P. 907(2).

To prevail on a claim of ineffective assistance of counsel, a PCRA petitioner must plead and prove that 1) the underlying issue is of arguable merit; 2) counsel had no reasonable strategic basis in support of the contested action or inaction; and 3) counsel's error was prejudicial to the petitioner such that the outcome of the proceeding would have been different but for the error.  **Commonwealth v. Fears**, 86 A.3d 795, 804 (Pa. 2014).  Counsel is

---

[1]  The page quoted above is labeled as page one of two.  The second page was omitted, apparently inadvertently, from Exhibit D.  Appellant's brief represents that the affidavit went on to state that police were transporting her to the homicide department but then turned around and brought her back home.  When she arrived and signed the consent form without reading it, police were already searching her home.  Appellant's Brief at 5.  These facts, even if they appeared of record, would not alter our conclusion that the absence of Dunbar's testimony did not prejudice Appellant.

presumed effective, and the petitioner bears the burden of proving otherwise.

*Id.* A petitioner alleging that counsel was ineffective for failing to call a potential witness must establish the following:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Commonwealth v. Sneed*, 45 A.3d 1096, 1109 (Pa. 2012).

The PCRA court found, and the record confirms, that Appellant failed to allege that his mother would have testified at a suppression hearing, or that his trial counsel knew or should have known of the alleged grounds for suppression. We observe, in addition, that Appellant did not list his mother among the witnesses he would have presented at a PCRA hearing. Appellant's Amended PCRA Petition, 6/22/16, at 11-12 (listing only Appellant and his trial counsel as PCRA hearing witnesses). As to counsel's knowledge of the grounds for suppression, Appellant makes the following concession in his brief: "Even though it may not have been expressly stated that trial counsel was aware of Appellant's mother, it can be inferred from Appellant's claim that he requested a motion to suppress that trial counsel was aware as the lack of consent would have been the basis for the motion." Appellant's Brief at 14, n.1. There appears to us to be no record support for drawing such an inference, inasmuch as Dunbar did not execute her affidavit until October of 2014, more than three years after the conclusion of trial and approximately

six months after Appellant filed his *pro se* PCRA petition. The record supports the PCRA court's finding that Appellant failed to allege prongs three and four of the analysis described in **Sneed**.

In hope of avoiding this conclusion, Appellant states in his brief that he would have testified at a PCRA hearing that he informed trial counsel about his mother's allegedly defective consent to the search. **Id.** at 13. This allegation should have been included in Appellant's petition or amended petition or, at the very least, in a response to the trial court's Rule 907 notice. **See American Housing Trust, III v. Jones**, 696 A.2d 1181, 1185 n.6 (Pa. 1997) (noting that appellate courts will not consider facts alleged for the first time in an appellate brief). We will not consider factual allegations raised for the first time in Appellant's brief.

In addition to Appellant's failure to allege that Dunbar would have testified at a suppression hearing and/or that trial counsel was aware of Dunbar's potential testimony, we agree with the PCRA court's conclusion that the absence of Dunbar's testimony was not prejudicial to Appellant. As set forth in the PCRA court's opinion, quoted above, the Commonwealth presented the testimony of multiple eyewitnesses. They accounted for all of Appellant's actions during the shooting, including emerging from the driver's side of a gold car with a large firearm in both hands, shooting the victim, standing over and continuing to shoot the fallen victim, getting back into the gold car and departing from the scene. One eyewitness, the victim's sister, Tamika Sims,

had known Appellant for nearly a decade and so could recognize him. In our memorandum on direct appeal, in which we rejected Appellant's challenge to the sufficiency of the evidence, we observed that "both Tamika Sims and Tayanna Slusher unequivocally identified [Appellant] as the murderer." *Commonwealth v. James*, 3025 EDA 2011 (Pa. Super. June 24, 2011) unpublished memorandum, at 7. Appellant was known as "Q," and the record confirms that Appellant had that letter tattooed on his right forearm. In light of the overwhelming body of evidence against Appellant, we cannot conclude that the outcome of trial would have been different without the fruits of the search—a stash of live shotgun shells identical to the spent shells recovered from the scene.

Moreover, Appellant fails to address the likelihood of success of a suppression motion, even had trial counsel filed one. The record contains Dunbar's consent form, which she signed directly underneath a sentence printed in large font and all capitalized letters, acknowledging her understanding of her constitutional right to refuse permission for the search. Appellant's Memorandum of Law in Support of Amended PCRA Petition, 6/23/16, at Exhibit C. Dunbar signed the same form a second time on the bottom, acknowledging a list of items removed from her home. *Id.* The suppression court would have considered this form in assessing the credibility of Dunbar's subsequent claim that she did not understand the form and did not consent to the search.

Philadelphia Police Officer Manuel Soto described how he arrived at Dunbar's apartment and gained entry shortly after the shooting. He testified that he responded to a radio call of shots fired on June 14, 2008. N.T. Trial, 6/22/11, at 153. He arrived while another officer was performing CPR on the victim. *Id.* at 154. Officer Soto spoke with Slusher, who identified Appellant as Q and stated that she knew he lived on Conestoga Drive. *Id.* at 156. Another witness, the victim's girlfriend, accompanied Officer Soto in his service vehicle to Dunbar's apartment building and pointed to an apartment on the third floor. *Id.* at 157-59. Officer Soto and his partner received no answer when they knocked, but they encountered Dunbar on their way back down the steps. *Id.* at 160. Dunbar let them into her apartment and they searched "for Mr. Q to clear the premises." *Id.* at 161. Dunbar acknowledged that Appellant was her son and gave police a photograph and told them Appellant's real name. *Id.* at 162-63. While in Dunbar's apartment, Soto and his partner observed a cartridge tray with live .9mm ammunition. *Id.* at 164. Officer Soto then called for another officer to secure the scene. *Id.* at 165.

Detective Timothy Bass testified that he arrived at Dunbar's apartment with another detective, introduced himself, presented Dunbar with a consent form and explained it to her. N.T. Trial, 6/23/11, at 37. Detective Bass stated that he and Dunbar filled out the form together and she signed it. *Id.* Thus, to succeed in a motion to suppress, Appellant, at a minimum, would have had to persuade a suppression court that Officer Soto and Detective Bass were not

credible. Additionally, we observe that Appellant's brief does not develop any argument with regard to Dunbar's apparent consent to Officer Soto's entry, and/or whether the doctrine of hot pursuit or any other legal doctrine would or would not have justified Officer Soto's entry.

In light of all of the foregoing, we discern no error in the PCRA court's decision to dismiss Appellant's petition without a hearing. The record supports the PCRA court's finding that Appellant failed to allege that Dunbar would have testified and that trial counsel was aware of her potential testimony. Furthermore, the PCRA court did not err in finding that no prejudice arose from the absence of Dunbar's testimony. We therefore affirm the PCRA court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/25/19